**HOME INSURANCE COMPANY, Plaintiff,**

v.

**WAYCROSSE, INC., Mail–Merged into Cargill, Inc., a Delaware corporation and Silent Knight Security Systems, Inc., aka Waycrosse, Inc., Defendants.**

No. Civ. 3–95–1056.

United States District Court, D. Minnesota, Third Division.

Aug. 13, 1996.

Gary R. Selvin, Larson & Burnham, Oakland, CA, Lindsay O. Arthur and Joseph D. O'Brien, Chapman, Kettering, Smetak & Pikala, Minneapolis, MN, for plaintiff.

Christopher R. Benson and Joseph A. Uradnik, Arnold, White & Durkee, Minneapolis, MN, for defendants.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Plaintiff Home Insurance Company ("Home Insurance") commenced this action ("Insurance Action") in the Northern District of California seeking a declaration that it did not have a duty to defend or indemnify Defendants for claims raised in a separate civil action filed against Defendants and others styled *Life Point Systems, Inc. et al. v. Cargill, Inc.*, No. 93–20352, pending in the Northern District of California ("Life Point Action"). The present lawsuit was subsequently transferred to this Court pursuant to 28 U.S.C. § 1404(a). This Court has jurisdiction under 28 U.S.C. § 1332. Currently before the Court is Home Insurance's Motion for Partial Summary Judgment. For the reasons set forth below, the Court will deny that Motion and enter an order declaring that Home Insurance has a duty to defend Defendants in the Life Point Action.

### Background

#### I. Parties

There are numerous corporate entities involved in this and the Life Point actions, descriptions of which follow. The role these various entities played in the underlying events in this action will be separately set out in Parts II through IV, *infra*.

Plaintiff Home Insurance is a New Hampshire insurance corporation with its principal place of business in New York; it issued insurance policies to the named Defendants.

Defendant Cargill, Inc. ("Cargill") is a Delaware corporation with its principal place of business in Minnetonka, Minnesota. It is a Defendant in this action as well as the Life Point Action in California. Defendant Waycrosse, Inc. ("Waycrosse") was a Minnesota corporation until it merged into Cargill in June 1991. It is named as an insured in several of the insurance policies at issue, and is also a Defendant in both this action and the Life Point Action. Defendant Silent Knight Security Systems, Inc. ("Silent Knight") was a division of Waycrosse until Waycrosse merged into Cargill. After the merger, Silent Knight was acquired by Willknight, Inc. ("Willknight"), a wholly-owned subsidiary of Cargill. Silent Knight makes security systems for residential, commercial and institutional use. It is also a named insured under the policies and is a Defendant in both this and the Life Point actions. Willknight is involved in this action as a Counter Claimant, having joined Cargill in counter claiming against Home Insurance in an attempt to require Home Insurance to defend it in the underlying Life Point Action; Willknight is named as an insured on one of the policies at issue in this litigation.

Although not named as parties in this action, several other entities are involved in the underlying events at issue. The plaintiffs in the Life Point Action are Axonn Corp. ("Axonn"), Life Point Systems, Inc. ("Life Point"), and Life Point Systems Ltd. Partnership (collectively "Life Point Plaintiffs"). One of the Defendants in the Life

Point Action is Voyagers Technologies, Inc. ("VTI"), a California corporation engaged in the electronics industry. Voyager Security Systems Partnership ("VSS") is a California partnership; according to the Life Point Action Complaint, VSS's partners include Cargill, its subsidiaries Silent Knight and Waycrosse, VTI, and several other unrelated entities. (Life Point Action Compl. ¶ 12, attach. at O'Brien Aff., Ex. C.) As discussed in more detail below, VSS is involved in this action because several of the claims for which Defendants in this action seek a defense and indemnity are related to VSS's activities and dealings with the Life Point Action Plaintiffs.

## II. The Life Point Action

The claims in the Life Point Action arise out of a business relationship between the Life Point Plaintiffs and, *inter alia*, the Defendants in this action.[1] The Life Point Plaintiffs allege that in 1988, Axonn developed a "spread spectrum radio frequency device" ("Radio Device") to be used in security and fire protection systems. (Life Point Action Compl. ¶ 17.) Axonn, in conjunction with a Research and Licensing Agreement entered into with Life Point, subsequently applied for and received a patent on the Radio Device. (*Id.* ¶ 19.) In April, 1989, the Life Point Plaintiffs began negotiating a license agreement with Defendants Silent Knight and Waycrosse. (*Id.* ¶ 21.) Following these initial negotiations, on June 15, 1989, Life Point, Silent Knight, and Waycrosse entered into a Confidentiality Agreement whereby Life Point gave Silent Knight and Waycrosse confidential, proprietary and trade secret information relating to the Radio Device in anticipation of the parties executing a license agreement. (*Id.* ¶ 23.) As part of this Confidential Agreement, Silent Knight and Waycrosse agreed not to disclose any proprietary information to third parties. (*Id.* ) The Life Point Plaintiffs allege that they continued to disclose their intellectual property to Silent Knight and Waycrosse pursuant to and in reliance upon the Confi-

dentiality Agreement throughout the period June 15, 1989 to the end of that year. (*Id.* ¶ 25.) On December 4, 1989, Cargill entered the licensing negotiations on behalf of Silent Knight and Waycrosse, which were Cargill subsidiaries at that time. (*Id.* ¶ 26.)

In early January, 1990, Cargill, Silent Knight and Waycrosse abruptly broke off their licensing negotiations with the Life Point Plaintiffs. (*Id.* ¶ 35.) The Life Point Plaintiffs allege that these Defendants wrongfully disclosed confidential, proprietary and trade secret information Life Point had previously given to them during the course of the initial licensing negotiations in violation of the Confidentiality Agreement. (*Id.*) In April and May of 1990, the Life Point Plaintiffs attempted to reopen licensing discussions with Silent Knight and Waycrosse. (*Id.* ¶ 39.) Thereafter, the Life Point Plaintiffs claim the Defendants encouraged Life Point to resume disclosing proprietary information to them, leading Life Point to conclude that a licensing agreement was a "virtual certainty." (*Id.* ¶ 41.) The revived negotiations did not last. In September, 1990, the negotiations were terminated and the Defendants ceased dealing with the Life Point Plaintiffs altogether. (*Id.* ¶ 41.)

The Life Point Plaintiffs claim that after receiving information relating to the Radio Device, the Defendants and others began an enterprise to wrongfully make, use and sell the Device and other related products developed from the confidential, proprietary and trade secret information disclosed to the Defendants in reliance upon the Confidentiality Agreement. The Life Point Plaintiffs allege that in December, 1990, Defendants "announced a joint venture to develop spread spectrum wireless security products via a partnership between Cargill, Waycrosse, Silent Knight and Voyager"—the VSS partnership. (*Id.* ¶ 43.) Although the VSS partnership was "announced" in December, 1990, the VSS partnership formally came into being when the VSS partnership agreement was

---

1. For the purposes of determining whether Home Insurance has a duty to defend, the issue raised in this Motion, the Court accepts as true the allegations in the underlying Life Point Ac-

tion Complaint. *See Fireman's Fund Ins. Co. v. Hartford Fire Ins. Co.,* 73 F.3d 811, 816 (8th Cir.1996).

executed by the member partners on June 21, 1991. (Uradnik Decl., Ex. A.)

Sometime after December 11, 1990, the Defendants published materials, solicited business and marketed and used Life Point's confidential proprietary and trade secret information.[2] The Life Point Action Complaint lists numerous examples of wrongfully published materials marketing and misrepresenting that the Defendants had developed a "spread spectrum" wireless security system when in fact that system was developed by Life Point, each of which example occurred after "late December," 1990. (*Id.* ¶¶ 45–59.)

Based on this conduct, Life Point alleges that the Defendants jointly and severally: (1) infringed on Life Point's patents; (2) engaged in unfair and false advertising in violation of the Lanham Act,[3] 15 U.S.C. § 1125; (3) breached the Confidentiality Agreement; (4) wrongfully disclosed, misappropriated, and converted trade secrets; (5) misappropriated and wrongfully converted trade secrets, proprietary information, technology and equipment; (6) engaged in unfair competition by causing consumer confusion and using and disclosing trade secrets and other proprietary information; (7) committed civil fraud; (8) tortiously interfered with Life Point's other contracts and business relations by, *inter alia,* making defamatory representations about Life Point and its Radio Device to Plaintiffs' licensees, prospective licensees and other businesses with whom the Life Point Plaintiffs were negotiating, and by making fraudulent misrepresentations about the Radio Device and associated technology; and (9) engaged in a civil conspiracy

to commit the previously described substantive violations. (*Id.* ¶¶ 62–93.) The Life Point Complaint seeks over $210 million in compensatory damages, over $250 million in punitive damages, broad injunctive relief, and costs and attorneys fees. (*Id.* at 47–48.)

### III. The Insurance Policies at Issue in this Insurance Action

The Defendants in this case are named insureds on one or more of four separate comprehensive general commercial liability insurance policies issued by Home Insurance. Pursuant to these policies and upon receipt of the Life Point Action Complaint, the Defendants requested Home Insurance provide a defense and indemnity, if any, for the claims alleged against them in that action. Home Insurance accepted this tender of defense subject to a reservation of rights that it could later challenge its obligation to defend or indemnify the Defendants. Pursuant to that reservation of rights, Home Insurance subsequently commenced this Insurance Action against the Defendants seeking a declaration that it had no duty to defend or indemnify the Defendants for the claims asserted against them in the Life Point Action. This Motion relates solely to Home Insurance's duty to defend.

### A. Policy from June, 1988 through January 1, 1990

The first policy upon which the Defendants rely was effective from June 1, 1988 through January 1, 1990. Waycrosse and Silent Knight are named insureds on this policy.[4]

---

2. The parties in this, the Insurance Action, dispute the date the Defendants' conduct occurred. The Life Point Action Complaint alleges that VSS was created "immediately after" events which occurred on December 11, 1990, and that "thereafter" the Defendants began publishing materials, soliciting business and marketing and using Life Point's proprietary information. (Life Point Action Compl. ¶ 44.) At least with respect to these allegations, the conduct did not occur prior to December 11, 1990.

3. In particular, Life Point alleges that between December 17, 1990 and the present, the Defendants:

specifically and falsely represented that devices, products, product designs and technolo-

gy which they were presenting to the market were:

a. Ones which did not infringe on [Life Point's] patents ...;

b. Ones which required no licensing from [Life Point]; [and]

c. Ones which were superior to that covered by [Life Point's] patent[s] ... notwithstanding the fact that they were in fact clearly infringing on said patents;

(Life Point Action Compl. ¶¶ 71–76.)

4. The portions of the first policy supplied to the Court do not list the named insureds. The Complaint in this Insurance Action states that the named insureds on this policy are "Waycrosse and others" (Compl. ¶ 5), and the Defendants represent in their Memorandum of Law that Way-

Three provisions of this policy are at issue in this Motion. The first describes the coverage for "advertising injury" and provides:

> The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of *advertising injury* to which the insurance applies, sustained by any person or organization and arising out of the conduct of the named insured's business, within the policy territory and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury even if the allegations in the suit are groundless, false or fraudulent. . . .

(O'Brien Aff., Ex. 1 (emphasis added).) The policy defines "advertising injury" as:

> injury arising out of an offense committed during the policy period occurring in the course of the Named Insured's advertising activities, if such injury arises out of libel, slander, defamation, violation o[f] right of privacy, piracy, unfair competition, or infringement o[f] copyright, title or slogan.

(*Id.*) Home Insurance seeks a declaratory judgment that the conduct alleged in the Life Point Action Complaint does not relate to an "advertising injury" under this first policy.

The second and third provisions at issue relate to the first insurance policy's exclusions. The two exclusions provide:

> This insurance does not apply:
>
> (1) to liability assumed by the Insured under any contract or agreement; [or]
>
> . . .
>
> (5) to advertising injury arising out of the conduct of any partnership or joint venture in the Declarations of the policy as a Named Insured . . .

(*Id.*) Home Insurance claims this exclusion applies and precludes coverage in this case because: (1) the Life Point Plaintiffs' claims arise out of breaches of the Confidentiality Agreement between them and the Defen-

dants in this action and (2) VSS—the partnership in which Cargill, Waycrosse and Silent Knight were partners—was not listed as a Named Insured on the policy.

The third provision at issue relates to coverage for "property damage," which provides coverage for "[l]oss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the occurrence that caused it."[5]

### B. Policies from January 1, 1990 through June 1, 1991

The second and third policies were effective from January 1, 1990 through June 1, 1991. They are substantially identical. These policies amended the terms of Home Insurance's "advertising injury" insurance to provide coverage for " '[a]dvertising injury' caused by an offense committed in the course of advertising your goods, products or services." (Commercial General Liability Coverage Form § 1, Coverage B at 1.b(2), attach. to O'Brien Aff., Ex. 2.) These policies also amended the definition of "advertising injury" as follows:

> "Advertising injury" means injury arising out of one or more of the following offenses:
>
> a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
>
> b. Oral or written publication of material that violates a person's right of privacy;
>
> c. Misappropriation of advertising ideas or style of doing business; or
>
> d. Infringement of copyright, title or slogan.

(*Id.* at § V pt. 1.)

As with the first policy, the second and third policies contained an exclusion barring coverage for breach of contract and for activ-

---

crosse and Silent Knight are named insureds on this policy (Def.'s Mem. of Law at 8) to which Home Insurance has not objected. For the purposes of this Motion, the Court will accordingly assume that both Waycrosse and Silent Knight are named insureds on the first policy.

5. Neither party provided the Court with a copy of that portion of the first policy which contains this provision; however, the parties do not dispute this is the correct language.

ities of undisclosed partnerships. The breach of contract exclusion excluded from coverage " '[a]dvertising injury' arising out of ... [b]reach of contract, other than misappropriation of advertising ideas under an implied contract." (*Id.* at § 1, Coverage B, pt. 2(b)(1).) The activities of undisclosed partnerships exclusion provided:

> No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

(*Id.* at § 2 pt. 4.)

Finally, the second and third policies provided coverage for "property damage," defined as:

> Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

(*Id.* at § V pt. 12.)

### C. Policy from June 1, 1991 through June 1, 1992

The fourth policy [6] under which the Defendants claim a duty to defend arises contained substantially identical definitions of the coverage available for "advertising injury," "property damage" and the exclusion for advertising injuries arising out of breach of contract as the second and third policies.[7] The fourth policy also expanded coverage available to business ventures of named insureds. Specifically, this policy amended the definition of insured persons as follows: "[n]ewly-acquired organizations are granted named insured status under the who is insured provision of the policy." (Def.'s Mem. in Opp'n to Mot. at 10.)

### IV. The Parties' Claims

Home Insurance claims the first policy does not apply and does not obligate it to provide a defense for the Defendants in this case because the illegal conduct described in the Life Point Action Complaint is alleged to have occurred after January 1, 1990—the date coverage under the first policy expired. Home Insurance then raises three separate arguments to show it has no duty to defend under the remaining three policies: (1) the policies exclude from coverage illegal acts committed by an undisclosed partnership such as VSS, and the illegal conduct described in the Life Point Action Complaint was committed exclusively by VSS, not named insureds under the policies in their separate corporate capacities; (2) the Life Point Action Complaint does not allege conduct which falls within the description of "advertising injury" contained in the second through fourth policies; and (3) the breach of contract exclusion in the policies applies and precludes coverage because the *Life Point* Plaintiffs' claims "arose out of" a breach of the Confidentiality Agreement between several of the Defendants and the Life Point Plaintiffs.

In response, the Defendants claim: (1) the conduct described in the Life Point Action Complaint arguably is alleged to have occurred prior to January 1, 1990; (2) this conduct describes an "advertising injury" under all four of the policies; (3) the policies' breach of contract exclusion does not apply to the majority of the Life Point Plaintiffs' claims; and (4) the Life Point Action Complaint alleges claims which also fall within the policies' coverage for "property damage."

### Discussion

This matter is before the Court on Home Insurance's Motion for Partial Summary Judgment. Under Rule 56 of the Federal Rules of Civil Procedure:

> [summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving par-

---

**6.** Neither party supplied a copy of the fourth policy to the Court. Based on the uncontested representations in the parties' memoranda, the Court will presume for the purposes of this Motion that this policy contains the terms as represented.

**7.** This policy "clarified" the definition of "property damage" to provide "[t]hat when there is a loss of use of tangible property that is not physically injured, the loss shall be deemed to occur at the time of the occurrence that caused it." (Def.'s Mem. in Opp'n to Mot. at 10.)

ty is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Initially, the movant bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In evaluating the movant's showing, the evidence offered by the non-moving party is to be believed and all justifiable inferences therefrom are to be drawn in a light most favorable to that party. *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986). The moving party will be entitled to judgment as a mater of law "when the non-moving party had failed to 'make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" *Barge v. Anheuser–Busch, Inc.,* 87 F.3d 256, 258 (8th Cir.1996) (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552). Summary judgment is particularly appropriate where, as here, the unresolved issues are primarily legal rather than factual. *Schrier v. Halford,* 60 F.3d 1309, 1310 (8th Cir.1995); *Uhl v. Swanstrom,* 79 F.3d 751, 754 (8th Cir.1996); *see also John Deere Ins. v. Shamrock Indus.,* 929 F.2d 413, 417 (8th Cir.1991) (explaining that "the interpretation and construction of insurance policies is a matter of law, and therefore, such cases are particularly amenable to summary judgment" and finding insurer owed duty to defend as a matter of law).

■ In addition, courts have recognized that when an issue of law has been joined by both parties in a summary judgment motion, the court may enter judgment in favor of the nonmovant notwithstanding the nonmovant's failure to file a formal motion. *Mullen v. St. Paul Fire & Marine Ins.,* 972 F.2d 446 (1st Cir.1992); *Coach Leatherware Co. v. Ann-Taylor, Inc.,* 933 F.2d 162, 167 (2d Cir.1991); *McCarty v. United States,* 929 F.2d 1085, 1088 (5th Cir.1991); *Browning–Ferris Indus. v. Wake County,* 905 F.Supp. 312, 322 (E.D.N.C.1995); *Dayton Elec. Mfg. v. AP-COM, Inc.,* 782 F.Supp. 389 (N.D.Ill.1992); *see also* 6 James W. Moore, *Moore's Federal Practice* ¶ 56.12 & Supp. (1996) (citing cases

for same). In the present case, the Defendants have not filed a motion for summary judgment, but have requested in their Memorandum and at argument that summary judgment be entered in their favor on the issue of whether Home Insurance has a duty to provide a defense in the Life Point Action. The Court accordingly finds this issue of law amenable to summary resolution.

*I. Duty to Defend—Legal Standards*

■ The duty to defend under an insurance policy is broader than the duty to indemnify. *Fireman's Fund Ins. Co. v. Hartford Fire Ins. Co.,* 73 F.3d 811, 816 (8th Cir.1996) (quoting *St. Paul Fire & Marine Ins. Co. v. Briggs,* 464 N.W.2d 535, 539 (Minn.Ct.App.1990), *rev. denied* (Mar. 15, 1991)). Minnesota has established a difficult evidentiary burden which an insurance carrier must satisfy in order to avoid providing a defense to claims under its insurance policy. The Minnesota Supreme Court has explained that "[a] duty to defend an insured on a claim arises when *any* part of the claims is '*arguably*' within the scope of the policy's coverage" and that "an insurer who wishes to escape that duty has the burden of showing that *all* parts of the cause of action fall *clearly* outside the scope of coverage. *Jostens, Inc. v. Mission Ins. Co.,* 387 N.W.2d 161, 165–66 (Minn.1986) (emphasis added) (citations omitted); *Fluoroware, Inc. v. Chubb Group of Ins. Cos.,* 545 N.W.2d 678, 681 (Minn.Ct.App.1996) ("An insurer has an obligation to defend a claim against the insured when the claim falls 'arguably' within the coverage afforded by the policy"); *Tschimperle v. Aetna Casualty & Sur. Co.,* 529 N.W.2d 421, 424 (Minn.Ct.App.1995)("If any claim is arguably within the scope of coverage of the insurance policy, the insurer must defend"), *rev. denied* (May 31, 1995); *accord Fireman's Fund,* 73 F.3d at 816. Applying Minnesota law, the Eighth Circuit has further explained that "in determining whether there is a duty to defend, a court must give the benefit of the doubt to the insured" and that as a result, "unless the pleadings and facts clearly establish that the claim falls outside the policy terms, the duty to defend arises." *John Deere Ins. v. Sham-*

*rock Indus.*, 929 F.2d 413, 418 (8th Cir. 1991)(citations and quotations omitted).

In considering whether the duty to defend arises, the court considers the applicability of the duty as of the time the insured tendered the defense to the insurer. *Jostens*, 387 N.W.2d at 166. While the duty to defend is generally determined by comparing the allegations in the complaint with the language of the insurance policy, courts may look beyond the complaint to extrinsic facts to establish the existence or nonexistence of the duty to defend. *Tschimperle*, 529 N.W.2d at 424 (citing cases); *see also Fluoroware*, 545 N.W.2d at 681 (explaining that "[t]he complaint ... does not control when actual facts clearly establish the existence or nonexistence of the duty to defend") (citation omitted).

Thus in the present case, the Defendants are entitled to summary judgment on the issue of Home Insurance's duty to defend if any of the causes of action alleged in the Life Point Action Complaint "arguably" fall within the provisions of one of the policies at issue here. With the above standards guiding the analysis, the Court will address Home Insurance's various grounds for avoiding a duty to defend under its four policies.

## II. Whether a Duty to Defend Arises under the First Policy

Home Insurance argues that the illegal conduct in the Life Point Action Complaint is alleged to have occurred after the period of coverage under the first policy ended. The Court agrees.

The first policy was effective for the period June 1, 1988 through January 1, 1990. The Life Point Action Complaint does not contain language specifically alleging that illegal conduct occurred "prior to January, 1990," or words to that effect, nor does it specifically state that all illegal conduct occurred "after January, 1990." However, the only reasonable reading of the language used in the Complaint, as well as the structure of the Complaint itself, shows that the illegal conduct of which the Defendants are accused is alleged to have occurred after the first policy expired. The underlying facts in the Life Point Action Complaint are presented in chronological order. It alleges that the Life Point Plaintiffs' disclosed confidential information to the Defendants after execution of the Confidentiality Agreement on June 15, 1989. (Life Point Action Compl. ¶ 25.) The Complaint then alleges that the Defendants "broke off" negotiations in January, 1990 and began wrongfully disclosing proprietary information to others. (*Id.* ¶ 35.) The Complaint then describes a variety of events and particular examples of alleged illegal conduct arising out of the Defendants' failure to keep the Life Point Plaintiffs' proprietary information confidential. (*Id.* ¶¶ 36–59.) All of these events and examples relate to conduct which followed the termination of negotiations in January, 1990. The Court has carefully examined the Life Point Action Complaint and finds it cannot reasonably be construed to "arguably" assert claims against the Defendants for illegal conduct occurring prior to January 1, 1990. As a result, no duty to defend arises under the first policy.

## III. Whether a Duty to Defend Arises under the Second through Fourth Policies

The second through fourth policies provided coverage from January 1, 1990 through June, 1992. Defendants first claim the Life Point Action Complaint alleges claims which fall within the policies coverage for "advertising injuries." As noted above, Home Insurance alleges several grounds upon which to avoid a duty to defend under this provision. The Court will address each of these grounds in turn.

### A. Whether the Defendants are "Named Insureds" under the Policies

As a threshold issue, Home Insurance claims an "advertising injury," if any, was committed by VSS, not the individual insureds Cargill, Waycrosse, Silent Knight or Willknight. The Defendants do not dispute that "acts of the VSS Partnership itself are not covered" (Defs.' Mem. in Opp'n to Mot. at 18), and instead argue that at least some of the acts described in the Life Point Action Complaint were committed independently by the named insureds.

■ The Court agrees with the Defendants. First, and most importantly, VSS did not come into existence until the member partners executed the partnership agreement *on June 21, 1991.*[8] (Uradnik Decl. Ex. A.) As a result, the actions of Cargill, Silent Knight, Waycrosse and Willknight prior to June 21, 1991 "arguably" fall within the coverage available under the second through fourth policies. Second, the Life Point Action Complaint does not limit its claims solely to conduct taken by VSS; rather, it distinguishes among the Defendants' respective corporate capacities. For example, the Complaint alleges "Cargill, Waycrose, Silent Knight, Vail, VSS, Voyager [and others], conspiring together and acting in concert published materials, solicited business and marketed and used Life Point's confidential, proprietary and trade secret information." (Life Point Action Compl. ¶ 44.) If the claims were solely against VSS, the Complaint could have limited the allegations accordingly. Thus, it is at least "arguable" that the Complaint alleges the Defendants engaged in conduct taken in their separate corporate capacities. This is sufficient to trigger Home Insurance's duty to defend provided the conduct complained of falls within the "advertising injury" coverage and is not otherwise subject to a policy exclusion.

### B. Whether the Life Point Action Complaint Alleges an "Advertising Injury"

■ The Minnesota Court of Appeals has recently established a three-part test to determine whether "advertising injury" coverage creates a duty to defend: (1) the advertising activity must be a "direct" or "proximate" cause of the alleged injury; (2) the injury must fall within the scope of the policy's definition of "advertising injury"; and (3) there must be no policy exclusion otherwise barring coverage. *Polaris Indus. v. Continental Ins. Co.,* 539 N.W.2d 619, 621–23 (Minn.Ct.App.1995), *rev. denied*

(Minn. Jan 25, 1996); *accord, Fluoroware v. Chubb Group of Ins. Cos.,* 545 N.W.2d 678, 681 (Minn.Ct.App.1996).

### 1. Direct or Proximate Cause

■ In the present case, Defendants have satisfied the first *Polaris* requirement. In Count X of the Life Point Action Complaint, entitled "Tortious Interference with Contract," and Count XI, entitled "Tortious Interference with Business Relations," the Life Point Plaintiffs allege Defendants "made defamatory representations to Plaintiffs' licensees and prospective licensees" and to "businesses and corporations with whom Plaintiffs were negotiating" about Plaintiffs, and "made fraudulent misrepresentations with regard to the Device and the technology related to the Device." (Compl.¶¶ 85, 88, 89.) The Life Point Plaintiffs contend this conduct "violated the contract rights which Plaintiffs enjoyed with its licenses" (*id.* ¶ 84) and "violated the business relations between Plaintiffs and numerous businesses" (*id.* ¶ 88). Neither Count X nor XII specifically identifies which statements were defamatory or fraudulent misrepresentations about the Life Point Plaintiffs' products, and instead each incorporates the entirety of the factual allegations in the Complaint. Many of the factual allegations in the Complaint relate to statements Defendants made in advertising and marketing the Radio Device and related technology. So it is at least arguable that the "defamatory statements" and "fraudulent misrepresentations" identified in these Counts are statements made in connection with Defendants' advertising activities, and that these statements directly or proximately caused the injuries complained of in these Counts. As a result, the first prong of the *Polaris* test is satisfied.

### 2. Scope of the Policies' "Advertising Injury" Coverage

■ The second *Polaris* factor requires that the injury alleged in the complaint fall

---

8. Home Insurance claims the fact that VSS did not come into existence until June 21, 1991 is a "red herring" because the Life Point Action Complaint *alleges* VSS engaged in illegal conduct prior to that date. (Pl.'s Reply Mem. at 6.) Home Insurance's argument is not persuasive. As previously noted, courts may look beyond the com-

plaint to extrinsic facts to establish the existence or nonexistence of the duty to defend. *Tschimperle,* 529 N.W.2d at 424 (citing cases); *see also Fluoroware,* 545 N.W.2d at 681 (explaining that "[t]he complaint ... does not control when actual facts clearly establish the existence or nonexistence of the duty to defend").

within the scope of the policy's definition of "advertising injury." Under the second through fourth policies, Home Insurance must provide coverage for "advertising injuries" "caused by an offense committed in the course of advertising [the insured's] goods, products or services." As previously noted, "advertising injury" is defined to be one which arises out of one of, *inter alia,* "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." (Commercial General Liability Coverage Form § 1, Coverage B at 1.b(2), attach. to O'Brien Aff., Ex. 2, § V pt. 1.) As cited above, the Life Point Action Complaint accuses Defendants of two kinds of illegal communications: (1) making defamatory statements about the Life Point Plaintiffs, and (2) making fraudulent misrepresentations about "the Device and the technology related to the Device." The first of these is, without question, arguably within the policies' coverage for "publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." Although the second of these does not identify whether the subject "Device" and related technology is the Life Point Plaintiffs' "goods, products or services," at least one tenable reading of this language is that the fraudulent misrepresentations were about Life Point's Device and technology the Life Point Plaintiffs developed. As a result, this second type of communication arguably "disparages a person's or organization's goods, products or services" and thus is also arguably within the policies' definition of "advertising injury." Thus the second *Polaris* factor is satisfied.

### 3. Exclusions

█ The third *Polaris* factor considers whether the policies in question contain an exclusion barring coverage. Home Insur-

ance relies on the policies' "contract exclusion" to claim a duty to defend does not arise in this case.[9] That provision excludes from coverage " '[a]dvertising injury' arising out of .. [b]reach of contract, other than misappropriation of advertising ideas under an implied contract." (*Id.* at § 1, Coverage B, pt. 2(b)(1).) Home Insurance claims that this exclusion applies because "[a]ll of Life Point's claims originated from, and are connected with, the disclosure of confidential information pursuant to a confidentiality agreement (or agreements)." (Pl.'s Reply at 5.) This is manifestly not the case for *all* of Life Point's claims. Significantly, the defamation and fraudulent misrepresentations alleged in Counts X and XI of the Life Point Action Complaint do not refer to the Confidentiality Agreement and are not necessarily connected with the alleged wrongful disclosure of information conveyed in breach of that Agreement. As a result, the injuries alleged in Counts X and XI are "arguably" outside the scope of the contract exclusion. Home Insurance has failed to show any other policy exclusions apply. Accordingly, the third and final *Polaris* factor is satisfied.

### IV. Summary

Based on the materials and record as currently presented, the Court finds the allegations in Counts X and XI of the Life Point Complaint sufficient to trigger Home Insurance's duty to defend. This ends the Court's inquiry.[10] *See Fireman's Fund Ins. Co. v. Hartford Fire Ins. Co.,* 73 F.3d 811, 816 (8th Cir.1996) ("if *any* part of a cause of action is arguably within the scope of coverage, the insurer must defend") (emphasis added) (applying Minnesota law); *Meadowbrook Inc. v. Tower Ins.,* 543 N.W.2d 418, 422 (Minn.Ct. App.1996) (explaining that "[i]f the complaint against the insured includes multiple claims, and one of the claims, if proved, would require the insurer to indemnify, the insurer

9. Obviously, Home Insurance has also argued as a threshold issue that the exclusion for undisclosed business organizations applies; this issue has been resolved against Home Insurance. *See* Part II, *supra.*

10. Specifically, the Court need not determine whether the remaining claims in the Life Point

Action Complaint arguably fall within the coverage for "advertising injury" provided under any of the policies, nor need it determine whether any of the claims in this Complaint arguably fall within the coverage for "property damage" under any of the policies.

must defend against all claims"), *rev. granted* (Apr. 1, 1996); *Tschimperle v. Aetna Casualty & Sur. Co.*, 529 N.W.2d 421, 424 (Minn.Ct. App.1995) ("If *any* claim is arguably within the scope of coverage of the insurance policy, the insurer must defend") (emphasis added). In reaching this conclusion the Court makes one important observation. The Court finds only that Home Insurance has not met its burden to show it may avoid a *duty to defend;* the Court has not determined that the policies at issue in fact provide coverage for any of the Life Point Plaintiffs' claims or, necessarily, that Home Insurance must indemnify the Defendants for any of these claims.

### Conclusion

Based on the foregoing, and upon all the files, records, and proceedings herein, **IT IS ORDERED** that:

(1) Plaintiff's Motion for Partial Summary Judgment (Doc. No. 35) is **DENIED;** and

(2) it is hereby **DECLARED** that Plaintiff has a duty to provide a defense to Defendants in the action styled *Life Point Systems, Inc. et al. v. Cargill, Inc.*, No. 93–20352, pending in the Northern District of California.